IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ANDREA K. SCHOENVOGEL, a minor, )
who sues by and through her mother )
and next friend, AVA SCHOENVOGEL; )
AVA SCHOENVOGEL, individually, )
)
                    Plaintiffs )         CASE NO. CV01-HGD-1881-S
)
    vs. )         **ENTERED**
)
)         SEP 0 2 2004
VENATOR GROUP RETAIL, INC. )
d/b/a LADY FOOTLOCKER; ESTATE )         UNITED STATES DISTRICT COURT
OF ANTHONY DASILVA, deceased, )         NORTHERN DISTRICT OF ALABAMA
)
                    Defendants )

## <u>MEMORANDUM OPINION</u>

The above-entitled civil action is before the court on the Motion for Partial Summary

Judgment filed by defendant Venator Group Retail, Inc. [Doc. #59], the motion for summary

judgment of Defendant Estate of Anthony DaSilva [Doc. #60], and the Motions to Strike

filed by defendants [Docs. #73, #75, & #76].

The Motions to Strike are MOOT. The court has considered any portions of

plaintiffs' submissions that may be considered consistent with Rule 56, Fed.R.Civ.P., and the

rules of evidence and has omitted consideration of any portions that are not in accordance

with applicable rules.



This matter is before the undersigned United States Magistrate Judge based upon the consent of the parties pursuant to 28 U.S.C. § 636(c)(1) and Rule 73, Fed.R.Civ.P. Plaintiffs, Andrea K. Schoenvogel and Ava Schoenvogel, as next friend and individually, assert claims against Venator Group Retail, Inc., d/b/a Lady Footlocker (Venator) for negligent hiring, supervision and retention of Anthony DaSilva (Count I); wanton hiring, supervision, retention and entrustment of DaSilva (Count II); and violation of the Employer's Liability Act (§ 25-6-1, *Ala. Code*) (Count VI). They assert a claim under § 6-5-370, *Ala. Code*, for felonious injury (Count VII) against the Estate of DaSilva, and claims against both Venator and the Estate of DaSilva for assault and battery (Count III), invasion of privacy (Count IV), outrage (Count V), and false imprisonment (Count VIII). Plaintiff Ava Schoenvogel submits an individual claim for loss of services of her daughter. The complaint alleges that on August 2, 2000, Andrea Schoenvogel, a minor, while working as an employee of Lady Footlocker at the Riverchase Galleria in Birmingham, Alabama, was sexually assaulted by Anthony DaSilva, her supervisor at the time. [Complaint at ¶¶ 2, 9, 10]. Very shortly after the alleged assault, DaSilva died. Based on this alleged incident, plaintiffs seek damages from the above-named defendants.

## FACTUAL BACKGROUND

Andrea Schoenvogel worked for Lady Foot Locker at the Galleria Mall in Birmingham from July to August 2000, supervised by DaSilva. She alleges that on August 2,

2000, DaSilva grabbed her wrists and pulled her into the back storeroom of the store.  She alleges that he pushed her face first against the wall and raped her from behind.  She further alleges that she resisted by telling him "no, please don't." [A. Schoenvogel Depo. at 87-99].[1]

Megan Sullivan began work for Venator in 1992 in Pennsylvania and worked for it for approximately one year.  [Sullivan Depo. at 12-13].  She later returned to work for Venator and, in August 1997, she became a management trainee.  [*Id.* at 20-21].  In May 1998, she became a store manager for the York (Pennsylvania) Lady Footlocker store.  [*Id.* at 25].  In 1997, while employed at the Harrisburg East Lady Footlocker, Sullivan met Anthony DaSilva.  [*Id.* at 39].  They began dating in approximately October of 1997, before Sullivan became a store manager.  At that time, DaSilva was employed by a store near Sullivan's place of employment called SilverTime.  [*Id.* at 41].

While they dated, Sullivan learned that DaSilva was a registered sex offender and that he had a drug problem for which he had been to drug rehabilitation in 1997.  [*Id.* at 43-45, 77].  She testified that she was unaware of the details of the offense that required him to register as a sex offender or of the fact that he had a conviction for a sex offense and a drug offense.  [*Id.* 43-46].  Eventually, Sullivan and DaSilva began to live together.  [*Id.* at 52-53].  He is the father of her child.  [*Id.* at 95-96].

---

[1] Although evidentiary submissions and argument by defendants appear to take issue with whether the assault ever truly occurred, the court views the disputed factual evidence in the light most favorable to the non-moving party for summary judgment purposes.  Therefore, for the purpose of disposing of these motions only, the court assumes that this claim is true.

In around January of 1999, Sullivan, now a Lady Footlocker manager, told DaSilva about a part-time position that was open at a Footlocker store and told him to apply for it if he was interested. [*Id.* at 25, 47-48, 52]. He was hired as a part-time employee. [*Id.* at 52]. At some point, he became a full-time employee and, eventually, a manager trainee. [*Id.* at 53]. Sullivan did not hire, participate in the decision to hire, recommend the hiring of, or supervise DaSilva as a Venator employee. [Sullivan Aff. ¶¶ 2-5; Chambers Depo. at 72; Chambers Aff. ¶ 6]. Before hiring him, Robin Chambers, the store manager in Pennsylvania who hired DaSilva, called his references. [Chambers Depo. at 73]. The feedback she received was all positive, especially from his employer at SilverTime. She also interviewed DaSilva and had another manager interview him before hiring him. Both thought he was a good candidate for the job. [Chambers Aff. ¶ 5]. Although Chambers had known Sullivan for many years, Sullivan never told Chambers that DaSilva had any problems with drug use or that he had a conviction for rape.[2] [Chambers Depo. at 70-71].

At the time DaSilva was hired, Venator's application form inquired whether the applicant had a felony conviction, but there was no policy requiring any additional criminal background checks. [Criscuolo Depo. at 35]. DaSilva falsified his application, denying that he had a felony conviction.

In May 1999, Sullivan moved to Birmingham to be a store manager at the Galleria Mall. [Sullivan Depo. at 57-58]. Shortly thereafter, DaSilva followed and took a position

---

[2] Actually, the conviction was for attempted rape. [Venator's Exh. 14]. However, this is a distinction without a difference.

at the Western Hills Kids Foot Locker. [*Id.* at 70-73]. DaSilva registered in Jefferson County, Alabama, as a convicted sex offender. [*Id.* at 84]. Sullivan left Birmingham in February or March of 2000 and returned to Pennsylvania. DaSilva was made store manager of the Galleria Lady Foot Locker Store that Sullivan had managed before her departure. [*Id.* at 74-75].

Venator has a policy against sexual harassment [Defendants' Exh. A at 801-02; Defendants' Exh. B at 13] and a procedure in place to train employees on the policy. Employees are instructed on how to report sexual harassment occurring on the job to a supervisor or district manager or to a phone number, 1-800-FAIR-4-YOU, set up for this purpose. [Chambers Depo. at 23-27; Plaintiffs' Exh. 2, at 202-04].[3] Employees are instructed that they are not to tolerate discriminatory acts and to seek counsel from the district manager and the Human Resource Development Department on all matters dealing with equal employment opportunities. [Defendants' Exh. A at 795-96].

Chambers reviewed the Venator anti-harassment policy with DaSilva, and he signed an acknowledgment that he was aware of the policy. [Chambers Depo. at 53-54, 84, 89; Plaintiffs' Exh. 1 at 50-51]. No employees in the Lancaster, Pennsylvania, store at which DaSilva first worked complained about him. [Chambers Aff. ¶ 9]. Likewise, DaSilva's manager at the Western Hills Kids Foot Locker Store never received any complaint from any

---

[3] Venator's general policy on handling customer complaints requires that customer complaints be written down. This requirement, however, is contained in a training program section relating to exchanges, adjustments, credits or refunds, rather than sexual harassment complaints. [Defendants' Exh. A at 722-23].

employee about DaSilva making an unwanted sexual advance. He never observed any conduct on DaSilva's part that he considered inappropriate or harassing. [Walker Aff. ¶ 5]. During the time DaSilva was the manager of the Galleria Lady Foot Locker, the district manager whose area of supervision included this store, Frank Diedrich, never witnessed or heard about DaSilva engaging in any sexual behavior and did not receive any complaints from employees, customers or anyone else regarding sexual comments or behavior by DaSilva. [Diedrich Aff. ¶¶ 6-11]. During the time DaSilva managed this store, Diedrich visited it two to three times and called the store weekly. [Id.].

The only evidence of prior complaints regarding DaSilva is the following. Alison Barnes testified that she and a friend, Alicia Burtyk, were customers at the Galleria Foot Locker prior to the alleged rape of Andrea Schoenvogel. Barnes claims that they were in the store on one occasion when DaSilva made them feel "very uncomfortable" by getting close to them and calling them "honey," "baby" and "sweetie." [Barnes Aff.]. Barnes alleges that they went from this store to the Century Plaza Mall Foot Locker and mentioned his behavior to employees there. [Barnes Depo. at 70-71]. Barnes does not recall whether she identified DaSilva to the Century Plaza employees by name. She testified that she "mentioned the behavior of the Manager" of the Galleria store. [Id. at 70]. According to Barnes, these unidentified employees indicated that they knew what they meant because DaSilva acted the same way when he worked at Century Plaza. Barnes states she was told by the Century Plaza employees that DaSilva used to work at Century Plaza but was moved because they

complained. [*Id.* at 73]. Barnes never made a complaint about this alleged behavior to anyone at the Galleria Foot Locker. She did not attempt to contact DaSilva's supervisor and did not ask to speak to the manager at the Century Plaza store. Likewise, the tone of her conversation with the Century Plaza employees was "relatively casual," and she did not ask them to do anything about this incident. Barnes does not know any of these employees' names or their positions. [*Id.* at 69-73].

Alicia Burtyk testified that she felt uncomfortable while they were around DaSilva because he kept using the words "honey," "baby" and "sweetie" when talking to them and stood very close to Barnes while they were in the store. [Burtyk Depo. at 57]. She believed one of the people she and Barnes spoke to at Century Plaza was a manager. She does not state her basis for this conclusion. [Burtyk Aff.]. Burtyk never asked anyone at Foot Locker to pass this information on to anyone in the company, never called the company to complain and never talked to anyone else with Foot Locker about this incident. [Burtyk Depo. at 68]. Burtyk was "more worried about getting a pair of shoes" than she was about reporting DaSilva's behavior to anyone. [*Id.* at 62].

Robin Domit, the mother of part-time Galleria Lady Foot Locker employee Tiffany Sinyard, has submitted an affidavit. Domit states that she was told by a person she recognized as an assistant manager of the Century Plaza Foot Locker, that one Century Plaza employee refused to work at the Galleria store because of sexual comments that DaSilva made to her. [Domit Aff.].

Tiffany Sinyard states that while she worked with DaSilva, he made remarks to her such as "You have a nice body" and "Your butt looks nice." [Sinyard Aff.]. She believes he made such remarks to her on four or five occasions. She also states that "He did not bother me too much except that he did touch me on my butt a few times but I could not be sure whether he did it on purpose or not." [*Id.*]. No customers ever complained to Sinyard about DaSilva's behavior. [Sinyard Depo. at 38]. One other co-employee, Melanie DeStefino, told Sinyard she did not like DaSilva. However, Sinyard testified that this was due to the fact that DaSilva did not want DeStefino working there any more because he did not like her, not because of something sexual in nature. [*Id.* at 38-39]. Sinyard never had any problems with DaSilva's comments or actions. [*Id.* at 44]. There is no record evidence that Sinyard ever reported any actions by DaSilva to anyone.

Melanie DeStefino, a former assistant manager under DaSilva, states that she observed DaSilva take females to the back of the store on a regular basis and had observed him kissing one of them in the employee's bathroom. She further states that he tried to kiss a female employee and that several female customers reported to her that they would not come in the store while he was there because he flirted with them strongly and made them uncomfortable. [DeStefino Aff. at Plaintiffs' Tab 3]. However, she also stated that he never made any inappropriate remarks to her or attempted to touch her in an inappropriate way. [DeStefino Aff. at Defendants' Tab 27, ¶ 3]. She observed no conduct she believed to be

violent or forceful, and she never reported any complaints regarding any harassing behavior by DaSilva to company management. [*Id.* at ¶¶ 3-4].

Asha Cheeks currently works at the Galleria Lady Footlocker and previously worked at the Century Plaza Footlocker during the time that DaSilva worked at the Galleria. She never received any complaints about DaSilva, nor is she aware of any. [Defendants' Exh. 25, Aff. of Asha Cheeks].

Shaquanta Brown worked at the Century Plaza Lady Footlocker store when DaSilva worked at the Galleria store. She also worked as a substitute manager on occasion at the Galleria store at DaSilva's request. No customer or employee at either location ever complained to her about DaSilva's actions toward them. [Defendants' Exh. 20, Aff. of Shaquanta Brown].

Johna Williams-Luke was the manager of the Lady Footlocker at Century Plaza. Williams-Luke never received any employee or customer complaints concerning DaSilva's behavior. [Defendants' Exh. 28, Aff. of Johna Williams-Luke].

Don Wiggins, General Manager of the Galleria Mall, testified that there were never any customer or employee complaints regarding DaSilva's behavior when he worked at the Galleria Lady Footlocker store. [Defendants' Exh. 18, Aff. of Don Wiggins].

Risa Rench is the manager of the Fair Employment Practice division of Lady Footlocker. She was the Human Resource Manager for the company from December 2000 to June 2001 and a Fair Employment Practice Counselor from July 1999 to November 2000.

9

She was responsible for coaching and training managers and other employees on performance issues, including sexual harassment. She never received any complaints regarding Anthony DaSilva prior to Andrea Schoenvogel's rape claim. She also searched the Fair Employment Practice files and found no complaints. She was unaware that DaSilva had a criminal history and is unaware of anyone in upper management at Venator with such knowledge. [Defendants' Exh. 19, Aff. of Risa Rench].

Robert Wardley, Regional Vice President for the Southern Region of Lady Footlocker, was responsible for the supervision of the Lady Footlocker store at Galleria Mall in February 2000. In his capacity as Regional Vice President, employees could, and sometimes did, complain to him about employees in stores in his area. He never received any complaints regarding DaSilva and has no documentation reflecting any complaints. [Defendants' Exh. 31, Aff. of Robert Wardley].

## STANDARD OF REVIEW

This matter is considered by the court pursuant to the provisions of Rule 56, Fed.R.Civ.P. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). Thus, summary judgment is

appropriate where the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 332, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law governing the action determines whether an element is essential. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of the pleading, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *see Brown v. Crawford*, 906 F.2d 667, 669 (11th Cir. 1990), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991).

This circuit clearly holds that summary judgment should be entered when the moving party has sustained its burden of showing the absence of a genuine issue of material fact when all the evidence is viewed in the light most favorable to the non-moving party, *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir. 1983); *see also, Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512. The evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his or her favor. *Id.* at 255,

106 S.Ct. at 2514, *citing Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S.Ct. 1598,

1608-09, 26 L.Ed.2d 142 (1970). However, "[a] court need not permit a case to go to a jury,

however, when the inferences that are drawn from the evidence, and upon which the non-

movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th

Cir. 1996) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 592,

106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It is, therefore, under this standard that the court

must determine whether the plaintiffs can meet their burden of coming forward with

sufficient evidence as to each material element of their  claims sufficient to permit a

reasonable jury to find in their favor.


## DISCUSSION

### The Estate of Anthony DaSilva

The Estate of Anthony DaSilva (Estate) primarily relies on the application of the Dead

Man's Statute, § 12-21-163, *Ala. Code* (1975), as amended, as its basis for summary

judgment. Because of the conflicting authority regarding the statute's applicability in light

of the revised Alabama Rule of Evidence 601, this court certified a question to the Alabama

Supreme Court for clarification. In response, the Alabama Supreme Court held that the

Alabama Dead Man's Statute was superceded by Rule 601, Ala.R.Evid. *Schoenvogel ex rel.*

*Schoenvogel v. Venator Group Retail, Inc.*, 2004 WL 1535242 (Ala. July 9, 2004).

Therefore, plaintiffs' claims are not barred by the operation of this statute.

## *False Imprisonment*

The Estate also asserts that Andrea Schoenvogel's false imprisonment claim fails as a matter of law notwithstanding the application of the Dead Man's Statute because false imprisonment requires that there be some direct imprisonment of the person and, that, at a minimum, a plaintiff must request or attempt to leave the confined area. [Doc. #66, Estate of DaSilva's Brief in Support of Summary Judgment, at 21-22].

This argument is without merit. According to the testimony of Andrea Schoenvogel, she was physically overpowered by DaSilva and forcibly raped by him while he ignored her plea that he not do this. For there to be false imprisonment under Alabama law, "it is not necessary that there be confinement in a jail or a prison. Any exercise of force, or the express or implied threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment." *Big B, Inc. v. Cottingham*, 634 So.2d 999, 1001 (Ala. 1993). Plaintiffs have presented evidence that such is the case here sufficient to avoid summary judgment on their claim against the Estate of DaSilva for false imprisonment as alleged in Count VIII.

## *Felonious Injury*

The Estate asserts that plaintiffs' "felonious injury" claim is not cognizable under Alabama law. [Doc. #66, Estate of DaSilva's Brief in Support of Summary Judgment, at

23-24].  Count VII of the complaint asserts a claim for "felonious injury" pursuant to

§ 6-5-370, *Ala. Code* (1975), as amended.  This statute provides that "For any injury, either

to person or property, amounting to a felony, a civil action may be commenced by the party

injured without the prosecution of the offender."  The law in Alabama is clearly established

that "§ 6-5-370 does not create a cause of action; rather, it merely allows a plaintiff to

*commence* a civil action [for any injury amounting to a felony] even if the plaintiff does not

pursue criminal prosecution of the defendant." *Lewis v. Fraunfelder*, 796 So.2d 1067, 1070

(Ala. 2000).  Thus, § 6-5-370 only eliminates an obstacle for plaintiffs with a valid cause of

action; it does not *create* a civil cause of action for any injury that amounts to a felony.  *Id.*;

*Preskitt v. Lyons*, 865 So.2d 424, 429 (Ala. 2003).  Plaintiffs acknowledge that this is correct,

but urge the court to convert the § 6-5-370 claim into an identical common law claim as in

*Ages Group, L.P. v. Raytheon Aircraft Co., Inc.*, 22 F.Supp.2d 1310 (M.D.Ala. 1998).

However, because plaintiffs already are seeking damages for assault and battery, invasion

of privacy, outrage, and false imprisonment, the court declines to do so.  Therefore, summary

judgment in favor of the Estate of DaSilva is appropriate as to Count VII.


### *Assault and Battery, Invasion of Privacy and Outrage*

The Estate of DaSilva presented no argument in support of summary judgment, other

than the Dead Man's Statute, discussed above, as to Counts III, IV and V.  In the exercise of

caution, they are discussed herein.

An assault and battery is defined as any touching by one person of the person or clothes of another in rudeness, in anger, or in a hostile manner. An intent to injure is not required. *Surrency v. Harbison*, 489 So.2d 1097 (Ala. 1986). The evidence presented, when viewed in the light most favorable to plaintiffs, is sufficient to raise a genuine issue of fact for trial as to whether DaSilva committed an assault and battery as alleged in Count III.

Under Alabama law, an invasion of privacy includes, among other things, an intrusion upon the plaintiff's physical solitude or seclusion. *Phillips v. Smalley Maintenance Servs., Inc.*, 435 So.2d 705, 708 (Ala. 1983). Under this theory of liability, the invasion of privacy consists of "the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *McIsaac v. WZEW-FM Corp.*, 495 So.2d 649, 651 (Ala. 1986). Although intrusion into one's physical privacy is not necessary, where there is such conduct, the Alabama Supreme Court has had "no hesitancy" in concluding that the defendant's conduct constituted an invasion of privacy. *Phillips*, 435 So.2d at 711. When the evidence is viewed in the light most favorable to plaintiffs, a genuine issue of fact remains on the invasion of privacy claim alleged in Count IV.

In Count V, plaintiffs contend that the action of DaSilva was "extreme and outrageous and was beyond the bounds of normal decency." [Doc. #1, Complaint , ¶ 26]. To establish the tort of outrage, plaintiffs must allege three elements: "(1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result

from his conduct; (2) the conduct was extreme and outrageous; and (3) the distress was severe." *Moore v. Spiller Associated Furniture, Inc.*, 598 So.2d 835, 836 (Ala. 1992) (quoting *Perkins v. Dean*, 570 So.2d 1217, 1219 (Ala. 1990)).

The Alabama Supreme Court has found egregious sexual harassment sufficient to support a claim of outrage. *Busby v. Truswal Sys. Corp.*, 551 So.2d 322, 324 (Ala. 1989). The factual basis to support such a claim generally occurs "when the sexual impositions are not merely verbal or economic, but become physical impositions." *Brewer v. Petroleum Suppliers, Inc.*, 946 F.Supp. 926, 936 (N.D.Ala. 1996) (citing *Busby*, 551 So.2d at 324).

> An employee can decline even the most obscene request to be touched in a sexual manner. An employee cannot decline a physical act that has already occurred. At that point, the harasser's conduct goes beyond the simply base and oversteps the tolerable bounds of a civilized society.

*Id.* Assuming Andrea Schoenvogel's contentions are true, DaSilva's actions alleged in Count V would constitute outrageous conduct.

Therefore, the motion for summary judgment of the Estate of Anthony DaSilva is due to be denied with regard to plaintiffs' claims of assault and battery, invasion of privacy and outrage.

## *Loss of Services*

No motion for summary judgment has been made by the Estate of DaSilva as to Ava Schoenvogel's individual claim of loss of services. Therefore, this claim may go forward.

**Venator Group Retail, Inc.**

Venator asserts that plaintiffs have failed to offer any substantial evidence that Venator knew or should have known that DaSilva would rape plaintiff Andrea Schoenvogel and that all claims against it, therefore, must fail. [Doc. #65, Venator's Memorandum in Support of Partial Summary Judgment, at 18].

*Negligence and Wantonness*

Plaintiffs allege in Count I that Venator breached its duty to refrain from hiring and retaining an employee that would engage in the actions described above and that it breached its duty to supervise or terminate DaSilva for his improper conduct and otherwise failed to act with due care to prevent the actions described above. They allege that Venator was negligent in hiring, supervising, retaining and entrusting DaSilva, in that it knew, or in the exercise of reasonable care, should have known, that Anthony DaSilva never should have been hired or retained with his previous drug addiction, criminal convictions and behavior towards women. [Doc. #1, Complaint, ¶¶ 11-13].

In Count II, plaintiffs allege that Venator's actions were wanton in hiring, supervising, retaining and entrusting DaSilva, in that it knew, or in the exercise of reasonable care, should have known, that Anthony DaSilva never should have been hired or retained with his previous drug addiction, criminal convictions and behavior towards women. [*Id.* at ¶¶ 14-16].

17

Alabama recognizes a cause of action for negligent or wanton supervision. *Big B, supra*; *Northwestern Mut. Life Ins. Co. v. Sheridan*, 630 So.2d 384 (Ala. 1993); *Thompson v. Havard*, 235 So.2d 853 (Ala. 1970). To recover against Venator under this theory, plaintiffs must show "by affirmative proof that the alleged incompetence of the employee was actually known to the employer or was discoverable by the employer if it had exercised care and proper diligence." *Ledbetter v. United Am. Ins. Co.*, 624 So.2d 1371, 1373 (Ala. 1993). This may be done by showing specific acts of incompetency and showing that they were brought to the attention of the master, or by showing them to be of such a nature, character, and frequency that the master, in the exercise of due care, must have had notice of them. While specific acts of alleged incompetency cannot be shown to prove that the servant was negligent in doing or omitting to do the act complained of, it is proper, when repeated acts of carelessness and incompetency of a certain character are shown on the part of the servant, to leave it to the jury to determine whether they would have come to the master's knowledge had the master exercised ordinary care. *Mardis v. Robbins Tire & Rubber Co.*, 669 So.2d 885, 889 (Ala. 1995). A plaintiff must also show a causal connection between the employer's breach of the duty to reasonably supervise and the plaintiff's injuries. *Patterson v. Augat Wiring Sys., Inc.*, 944 F.Supp. 1509, 1529 (M.D.Ala. 1996) (citing *Keel v. Banach*, 624 So.2d 1022, 1026 (Ala. 1993)).

The Alabama Supreme Court also has held that an employer "must use due care to avoid the . . . retention of an employee whom [the employer] knows or should know is a

person unworthy, by habits, temperament, or nature, to deal with the persons invited to the premises by the employer." *Brown v. Vanity Fair Mills, Inc.*, 277 So.2d 893, 894 (Ala. 1973). To recover for negligent retention in Alabama, a plaintiff must show breach of the employer's above duty and that such breach proximately caused the plaintiff's injury. *Id.*

Plaintiffs assert that Venator knew, or should have known, about DaSilva's criminal record and registered sex offender status when it hired DaSilva and when it promoted him to the position of manager of the Lady Foot Locker store at the Galleria Mall. They attempt to impute knowledge of DaSilva's criminal history, drug abuse and registered sex offender status through Megan Sullivan because of her status as a manager for Venator. They also attempt to show a pattern of sexually harassing conduct by DaSilva which allegedly was reported to other unidentified Foot Locker employees.

With regard to the information about DaSilva's background known to Sullivan, the law in Alabama is that knowledge of an agent may be imputed to the principal as a matter of law, creating an incontestable presumption, only when the agent acquires the knowledge as an incident to the transaction of the business of the principal. *Williams v. Fundaburk*, 185 So. 383, 384 (Ala. 1938); *R.B.Z. v. Warwick Dev. Co.*, 725 So.2d 261, 264 (Ala. 1998). Sullivan was not involved in the hiring of DaSilva or in his promotion to manager. Thus, her knowledge cannot be imputed to Venator.

As noted by defendants, "[t]he foreseeability of the harm that could result to [plaintiff] from their conduct, therefore, is the test of whether they breached their duty to provide

[plaintiff] with a safe workplace." *Morris v. Merritt Oil Co.*, 686 So.2d 1139 (Ala. 1996). There is no evidence that the claims that DaSilva stood too close to a female customer and used terms like "honey," "baby" and "mamacita" to address female customers ever were passed on to management officials at Venator. In fact, two witnesses to this alleged conduct, Barnes and Burtyk, never did anything other than tell some unknown employees at the Century Plaza store about their experience with DaSilva. They never made or attempted to make a formal complaint regarding this alleged conduct. Further, there is no evidence that any Foot Locker employee reported to management that DaSilva had harassed any customer or other employee. Even assuming that these claims had come to the attention of Venator, such facts would not have put Venator on notice that DaSilva would possibly rape a co-employee.

Plaintiffs also contend that, had the defendant performed a criminal history check, it would have discovered DaSilva's criminal history. They also contend that, because DaSilva was registered in Alabama as a sex offender, a check of this registry would have caused Venator to discover that DaSilva was a sex offender.

At the time DaSilva was hired, any criminal history check would have had to be done locality by locality because there was no national database available to employers. [Singleton Aff. ¶ 5]. DaSilva's conviction for attempted rape occurred in Schenectady, New York. [Defendants' Exh. 14]. His job application reflects that he was employed at one time in that

city [Plaintiffs' Exh. 9, DaSilva Job Application with Venator], and it is reasonable to assume that, if a criminal history check had been done, it would have included that locality.

The State of Pennsylvania, where DaSilva initially was hired, does not maintain a web site which lists the names of registered sex offenders. [Singleton Aff. ¶ 8]. The court is aware that there is currently a database available online through the Alabama Department of Public Safety that contains a list of all the registered sex offenders in the State of Alabama. It contains, among other things, the offender's name, address, date of birth and photograph. However, the court does not know if this database was available when DaSilva was hired in Alabama or promoted to the position of manager, and plaintiffs have provided no such evidence either. Nevertheless, even if not available through the Internet, this information was publicly available under Alabama law at that time. However, plaintiffs have not cited nor has the court found any case law placing on employers a legal obligation to conduct a criminal history check of prospective or current employees absent some objective reason to do so.

While Venator did not perform any background checks on DaSilva, it has presented testimony that, at the time he was hired and promoted, it was not common industry practice to do so. [Singleton Aff. ¶¶ 3-4]. This is due to a variety of reasons, including limited resources, false negative and false positive results, legal liability for such things as invasion of privacy, and high employee turnover. [*Id.* ¶ 4].

What Venator did do included personally interviewing DaSilva.  He made a good impression.  It also used an application which made inquiries about prior felony convictions and contacted former employers for references regarding DaSilva to see if he would be a suitable employee.  The references were good and reflected no information that would have indicated that DaSilva was a sex offender.  Venator also put DaSilva through a training program where he was made aware of the store's sexual harassment policy, and he worked on numerous occasions alone with various female co-employees and customers.  Venator never received a single complaint regarding DaSilva's conduct from any employee or customer before or after his promotion to manager.  [Diedrich Aff. ¶¶ 6-11; Wiggins Aff. ¶¶ 4-5; Rench Aff. ¶¶ 3-6; Wadley Aff. ¶¶ 2-3].  Complaints to or statements by unknown, unidentified employees of Foot Locker, who may or may not have been management personnel, are insufficient to prove Venator had notice of DaSilva's alleged harassment, especially considering the informal manner in which the complaints were presented.  Even assuming the employees referenced by plaintiffs are store managers, such evidence is still hearsay because it cannot be shown that any of the statements offered by plaintiffs were within the scope of any of these employees' agency. *See Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560, 1565-66 (11th Cir. 1991).  In addition, most instances involve double hearsay which is not avoided by attempting to invoke Rule 801(d)(2)(D), Fed.R.Evid.  *See Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1457 (11th Cir. 1997).  Finally,

there is no evidence that any of these events ever were reported to DaSilva's supervisor or above.

Under these circumstances, despite Venator's failure to do a criminal history/sex offender check on DaSilva, plaintiffs have not created a genuine issue of material fact as to whether Venator failed to exercise care and proper diligence to discover, at any point along the way, that DaSilva would present a danger to Andrea Schoenvogel. Therefore, it cannot be liable for negligence in hiring, supervising or retaining DaSilva as alleged in Count I.

Furthermore, in order to recover for wanton supervision or retention, plaintiffs must show that Venator had some degree of consciousness that injury was likely to occur from its act or omission. *Big B*, 634 So.2d at 1004. A review of the record fails to establish wanton conduct on the part of Venator. Therefore, Venator cannot be liable for wanton conduct as alleged in Count II.

## *Assault and Battery, Invasion of Privacy and Outrage*

For Venator to be liable for any of the intentional torts alleged by plaintiffs, they must show that: (1) DaSilva's wrongful acts were committed in the line and scope of employment; or (2) that the acts were committed in furtherance of Venator's business; or (3) that Venator participated in, authorized or ratified the wrongful acts. *Mardis*, 669 So.2d at 889; *Potts v. BE & K Constr. Co.*, 604 So.2d 398, 400 (Ala. 1992).

23

Conduct aimed at satisfying one's own lustful desires serves no corporate purpose. *Busby*, 551 So.2d at 327. Thus, there is no evidence that DaSilva's actions were committed within the line and scope of his employment or committed in furtherance of Venator's business.

To show that Venator ratified the conduct of DaSilva, plaintiffs must show that Venator (1) had actual knowledge of DaSilva's tortious conduct and that the tortious conduct was directed at and visited upon Andrea Schoenvogel; (2) that based upon this knowledge, Venator knew, or should have known, that such conduct constituted a tort; and (3) that Venator failed to take "adequate steps" to remedy the situation. *Mardis*, 669 So.2d at 889; *Potts*, 604 So.2d at 400. There is no evidence that Venator acquired actual notice of DaSilva's conduct until after Andrea Schoenvogel reported that she had been raped by DaSilva. Thus, Venator lacked actual knowledge and was unable to take any steps to remedy the situation once it occurred because DaSilva died very shortly thereafter. Therefore, Venator cannot be held responsible for DaSilva's intentional torts alleged in Counts III, IV and V.

### *Employer's Liability Act*

Plaintiffs also seek compensation from Venator pursuant to the Alabama Employer's Liability Act, § 25-6-1, *Ala. Code* (1975). An action under this statute is barred if the Alabama Workers Compensation Act provides the exclusive remedy. *Stough ex rel. Stough v. B & B Pallet Repair, Inc.*, 778 So.2d 193 (Ala.Civ.App. 2000). While the Alabama

24

Supreme Court has stated that the exclusivity provisions of the Workers Compensation Act apply only to limit the liability of an employer (or its insurer) to the statutorily prescribed claims for job-related injuries, and do not afford protection for injuries not caused by job-related accidents, *Lowman v. Piedmont Executive Shirt Mfg. Co.*, 547 So. 2d 90 (Ala. 1989), recovery against an employer asserting Workers Compensation exclusivity has generally been limited to the intentional torts of outrage and intentional fraud. *Id.*; *Gibson v. Southern Guar. Ins. Co.*, 623 So.2d 1065 (Ala. 1993).

Although plaintiffs assert a claim for outrage against Venator, as noted above, Venator is not liable on the substantive claim. Therefore, there can be no recovery under § 25-6-1, even assuming the Workers Compensation Act exclusivity provisions are inapplicable to this tort claim because there is no significant evidence that Venator failed to use reasonable care to prevent the injury to Andrea Schoenvogel. The same is true with regard to the other alleged intentional torts. Therefore, Venator is entitled to summary judgment as to Count VI.

### *Loss of Services*

While Venator has not moved for summary judgment on Ava Schoenvogel's individual claim of loss of services, the claim nonetheless is due to be dismissed because Venator is entitled to summary judgment in its favor with respect to all claims made against it by Andrea Schoenvogel.

25

## CONCLUSION

Based on the foregoing, the court concludes that Venator's motion for summary is due to be granted in all respects. The court further concludes that the Estate of Anthony DaSilva's motion for summary judgment as to Count VII (felonious injury) is due to be granted. In all other respects, the motion for summary judgment by the Estate of Anthony DaSilva is due to be denied. A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this ___2ND___ day of September, 2004.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE

26